## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| **MARK KERNER** and **RONALD BALICKI**, on behalf of themselves and all others similarly situated,<br><br>     Plaintiffs,<br><br>v.<br><br>**NISSAN NORTH AMERICA, INC.**,<br><br>     Defendant. | Case No.<br><br><br>**CLASS ACTION**<br><br>**DEMAND FOR JURY TRIAL** |

## CLASS ACTION COMPLAINT

Mark Kerner and Ronald Balicki ("Plaintiffs"), through their attorneys, individually and on behalf of all others similarly situated, bring this class action Complaint against Defendant Nissan North America, Inc. ("Nissan" or "Defendant"), and its present, former, or future direct and indirect parent companies, subsidiaries, affiliates, agents, and/or other related entities. Plaintiffs allege the following on information and belief—except as to their own actions, counsel's investigations, and facts of public record.

### NATURE OF ACTION

1. This class action arises from Defendant's failure to protect highly sensitive data.

2. Defendant is engaged in the manufacture, sale and distribution of motor vehicles and related equipment and services.[1] Defendant employs over 21,000 individuals in its United States operations.[2]

---

[1] See *Home Page*, NISSAN, https://www.nissanusa.com/ (last visited June 30, 2026).
[2] *40 years of people, product and purpose*, NISSAN (May 17, 2023), https://usa.nissannews.com/en-US/releases/40-years-of-people-product-and-purpose.

3. According to Defendant, it uses Oracle PeopleSoft[3] ("Oracle") software to manage employee information, including payroll, tax administration, and other personnel records.[4] Thus, Defendant relied on Oracle to store a litany of highly sensitive personal identifiable information ("PII")—about its current and former employees. But Defendant lost control over that data when cybercriminals hacked Oracle in a data breach (the "Data Breach").

4. This is a "hub-and-spoke" data breach that involves a hub—a company that centralizes data (here Oracle)—who stores data for its numerous customers—the spokes (here Defendant).

5. In other words, Defendant had no effective means to prevent, detect, stop, or mitigate breaches of its employees' data—thereby allowing cybercriminals to steal its current and former employees' PII.

6. Plaintiffs are former employees of Defendant and Data Breach victims, having received an email notification from Defendant advising them that their PII was involved in the Data Breach (the "Breach Notice"). They bring this class action on behalf of themselves, and all others harmed by Defendant's misconduct.

7. The exposure of one's PII to cybercriminals is a bell that cannot be unrung. Before this data breach, its employees' and consumers' private information was exactly that—private. Not anymore. Now, their private information is forever exposed and unsecure.

**PARTIES**

8. Plaintiff, Mark Kerner, is a natural person and a citizen of Ohio, where he intends to remain.

---

[3] *See Home Page,* ORACLE PEOPLESOFT, https://docs.oracle.com/cd/E52319_01/infoportal/index.html (last visited June 30, 2026).
[4] *See* **Exhibit A** (the "Breach Notice").

2

9. Plaintiff Ronald Balicki is a natural person and citizen Michigan, where he intends to remain.

10. Defendant Nissan North America, Inc. is a Delaware corporation with its principal place of business at 1 Nissan Way Stop A-5-C, Franklin, Tennessee 37203.

## JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. Plaintiffs and Defendant are citizens of different states. And there are over 100 putative Class Members.

12. This Court has personal jurisdiction over Defendant because it is headquartered in Tennessee, regularly conducts business in Tennessee, and has sufficient minimum contacts in Tennessee.

13. Venue is proper in this Court because Defendant's principal office is in this District, and because a substantial part of the events, acts, and omissions giving rise to Plaintiffs' claims occurred in this District.

## BACKGROUND

### Defendant Collected and Stored the PII of Plaintiffs and the Class

14. Defendant is the North American subsidiary of Nissan Motor Corporation, which is a global car manufacturer that sells a full line of vehicles under the Nissan and INFINITI brands.[5] On information and belief, Defendant operates 1049 dealerships in the United States.[6] According

---

[5] *Nissan Motor Corporation*, LINKEDIN, https://www.linkedin.com/company/nissan-motor-corporation/about/ (last visited June 30, 2026).
[6] *Number of NISSAN dealerships in the United States in 2026*, SCRAPEHERO (June 23, 2026), https://www.scrapehero.com/location-reports/NISSAN-USA.

to Defendant, it the fastest-growing mainstream automotive brand in the U.S. over the past 12 months and experienced 12 consecutive months of dealer retail sales growth.[7]

15.     As part of its business, Defendant receives and maintains the PII of thousands of its current and former employees.

16.     In collecting and maintaining the PII, Defendant agreed it would safeguard the data in accordance with its internal policies, state law, and federal law. After all, Plaintiffs and Class Members themselves took reasonable steps to secure their PII.

17.     Indeed, Defendant's Employee and Contractor Privacy Policy states:

    a.     "Nissan…is committed to respecting the privacy rights of our employees, retirees, interns, job applicants and contractors (persons employed by a company with whom Nissan has contracted for services and whose workers perform work on behalf of Nissan), as well as individuals whose information we may receive from such employees and contractors (such as health plan participants or beneficiaries of insurance policies);"

    b.     "We may work with Service Providers or employers who also possess your information in connection with their services, such as sharing Personal Information of employees with a Third Party in order to provide you benefits (such as health insurance and related medical care). We also may use Service Providers to help us in our data-related activities. We require

---

[7] *Nissan U.S. Hits 12 Consecutive Months of Dealer Retail Sales Growth, Now America's Fastest-Growing Mainstream Brand*, NISSAN (May 18, 2026), https://usa.nissannews.com/en-US/releases/nissan-us-hits-12-consecutive-months-of-dealer-retail-sales-growth-now-americas-fastest-growing-mainstream-brand.

these Service Providers to agree to use your Personal Information only at our direction;"

c.  "[A]s an employee, intern, contractor or beneficiary, we may collect information that is considered sensitive including driver's license number, national or state identification number, citizenship status, immigration status, race, national origin, religious or philosophical beliefs, sexual orientation, Precise Geolocation, health diagnosis data, and genetic information. Except as otherwise explained in Disclosures of Personal Information above, we do not disclose such information except as required by law or with your consent;" and

d.  "We are committed to keeping your Personal Information secure. We have technical, administrative, and physical procedures and information security policies in place that are designed to safeguard your Personal Information from loss, misuse, or alteration."[8]

18.  Businesses like Defendant have duties to protect its current and former employees' PII and to notify them about breaches.

***Defendant's Data Breach***

19.  On or around June 25, 2026, Defendant sent its Breach Notice to its current and former employees.[9]

---

[8]  *Us Employment and Contractor Privacy Notice*, NISSAN (Dec. 21, 2023), https://www.nissanusa.com/legal/employee-privacy-policy.html.
[9]  *Submitted Breach Notification Sample*, CALIFORNIA DEPARTMENT OF JUSTICE, https://oag.ca.gov/ecrime/databreach/reports/sb24-625558 (last visited June 30, 2026).

20. Worryingly, in the Breach Notice, Defendant admitted that "Nissan] uses Oracle PeopleSoft software to manage employee information, including payroll, tax administration, and other personnel records. Oracle has informed us that there was a cyber event and that the personnel records of hundreds of companies may have been obtained by so-called threat actors. We have since learned that *Nissan was specifically targeted in this attack.*"[10]

21. Because of Defendant's Data Breach, at least the following types of Plaintiffs' PII was compromised:

     a.     Name;

     b.     Social Security number;

     c.     Contact information;

     d.     Banking information;

     e.     Financial and tax information; and

     f.     Dependent and/or beneficiary information.

22. Defendant reported to the California Attorney General's Office that the Data Breach began on May 27, 2026. And yet, Defendant waited until June 25, 2026, before it began notifying the class.[11]

23. Thus, Defendant kept the Class in the dark—thereby depriving the Class of the opportunity to try and mitigate their injuries in a timely manner.

24. And when Defendant did notify Plaintiffs and the Class of the Data Breach, Defendant acknowledged that the Data Breach created a present, continuing, and significant risk of suffering identity theft, warning Plaintiffs and the Class:

---

[10] Ex. A (emphasis added).
[11] *See Bubmitted Breach Notification Sample*, n. 9, *supra*.

a. **"Remain vigilant** for suspicious emails, phone calls, or text messages requesting personal or company information. Do not click on unfamiliar links or attachments;"

b. **"Change your passwords for all significant accounts (including your financial institutions)**, especially if you reuse passwords across personal or work accounts. Choose strong, unique passwords for each account,"

c. **"Enable multi-factor authentication (MFA)** wherever available, particularly for personal banking, email, and financial accounts;" and

d. **"Monitor your financial accounts and credit reports for any unusual or unauthorized activity.** Report anything suspicious immediately to your financial institution. Reject any requests for bank details, access or identity confirmations that you receive through unusual means (mail, messaging, phone call)."[12]

25. Defendant failed its duties when its inadequate security practices caused the Data Breach. In other words, Defendant's negligence is evidenced by its failure to prevent the Data Breach and stop cybercriminals from accessing the PII. And thus, Defendant caused widespread injury and monetary damages.

26. Since the Data Breach, Defendant claims that its "technical teams, along with external experts, have secured our systems and will continue to work with Oracle to address this issue. We have taken steps designed to end unauthorized access and to prevent further disclosure of the information."[13]

---

[12] Ex. A (emphasis in original).
[13] *Id*.

27.     But such simple declarations are insufficient to ensure that Plaintiffs' and Class Members' PII will be protected from additional exposure in a subsequent data breach.

28.     Defendant has done little to remedy its Data Breach. True, Defendant has offered some victims credit monitoring and identity related services.[14] But upon information and belief, such services are wholly insufficient to compensate Plaintiffs and Class Members for the injuries that Defendant inflicted upon them.

ShinyHunters and the Dark Web

29.     The cybercriminal group responsible for the Data Breach is the notorious "ShinyHunters" ransomware gang.

30.     The ShinyHunters threat actors are a well-known extortion group that commonly targets Salesforce, Snowflake, and other cloud "Software as a Service" environments for data theft.[15]

31.     From May 27, 2026, to June 10, 2026, cybersecurity researchers identified an active compromise and extortion campaign attributed to ShinyHunters targeting Oracle PeopleSoft application infrastructure.[16] ShinyHunters exploited what security researchers describe as a "gadget chain," a sequence of both known (old) and previously undisclosed (zero-day) vulnerabilities in Oracle PeopleSoft.[17]

---

[14] *See id.*

[15] Lawrence Abrams, *Nissan discloses employee data breach linked to Oracle zero-day attacks*, BLEEPING COMPUTER (June 29, 2026), https://www.bleepingcomputer.com/news/security/nissan-discloses-employee-data-breach-linked-to-oracle-zero-day-attacks/.

[16] *ShinyHunters Targets Education Sector with Oracle PeopleSoft Exploit*, MANDIANT (June 11, 2026), https://cloud.google.com/blog/topics/threat-intelligence/shinyhunters-targets-education-sector-oracle-exploit.

[17] *Oracle PeopleSoft Breached by The ShinyHunters Data Theft Attack*, PATHLOCK (June 11, 2026), https://pathlock.com/blog/security-alerts/peoplesoft-breached-by-the-shinyhunters/.

8

32.     The vulnerabilities enabled ShinyHunters to:

    a.     Authenticate as privileged users or bypass authentication entirely;

    b.     Execute actions through PeopleSoft's application layer as a legitimate user;

    c.     Access and extract records via legitimate application APIs; and

    d.     In some cases, gain full administrative control of the application.[18]

33.     However, the zero-day vulnerability chain was only part of the story: a significant contributor to attack success across affected organizations was systemic misconfiguration and poor security hygiene exploits.[19]

34.     ShinyHunters maintains a Data Leak Site ("DLS") on the dark web where it publishes stolen data in order to pressure organizations who were subject to a data breach.[20] On or around June 9, 2026, Oracle's customers began to receive extortion demands that were signed by the ShinyHunters extortion gang.[21]

---

[18] *Id.*
[19] *Id.*
[20] See *ShinyHunters Targets Education Sector with Oracle PeopleSoft Exploit,* n. 15, *supra.*
[21] See *Nissan discloses employee data breach linked to Oracle zero-day attacks*, n. 14, *supra.*



35.     Since then, ShinyHunters has begun leaking data stolen in these attacks on its DLS.[22] ShinyHunter's DLS states what sensitive PII users can expect to find, such as "credit card and payment details" and contain clickable "download" links where anyone can download sensitive data stolen in the Data Breach.[23]

36.     Thus, on information and belief, Plaintiffs' and Class Members' PII has already been published, or will be published imminently, on the dark web.

37.     As the Data Breach was being investigated, Mandiant, a division of Google dealing with threat intelligence and cybersecurity, began an effort to alert over 100 exposed organizations to assist in restricting access to vulnerable endpoints.[24] While several organizations successfully blocked the activity or remediated the vulnerabilities, others experienced compromise, resulting in stolen data being published on the ShinyHunters DLS.[25]

38.     Thus, through its inadequate security practices, Defendant exposed Plaintiffs' and

---

[22] *Id.*

[23] *See ShinyHunters Targets Education Sector with Oracle PeopleSoft Exploit,* n. 15, *supra.*

[24] *Id.*

[25] *Id.*

the Class's PII for sale and circulation on the dark web.

39.     On information and belief, Defendant has made no public statements regarding ShinyHunters or whether it paid a ransom demand. However, even if Defendant paid a ransom demand, this would not ensure the security of Plaintiffs' and the Class's PII. While ransomware groups usually remove stolen data from their data leak sites when a ransom is paid, there is no guarantee that the data will be deleted.[26] That data is valuable and can easily be sold to another threat actor, so there is little incentive to delete it.[27]

40.     Because of Defendant's Data Breach, the sensitive PII of Plaintiffs and Class Members was placed into the hands of cybercriminals—inflicting numerous injuries and significant damages upon Plaintiffs and Class Members.

***Plaintiffs' Experiences and Injuries***

<u>*Plaintiff Mark Kerner*</u>

41.     Plaintiff Mark Kerner is a former employee of Defendant. Plaintiff Kerner received Defendant's Breach Notice via email.

42.     Thus, Defendant obtained and maintained Plaintiff Kerner's PII.

43.     As a result, Plaintiff Kerner was injured by Defendant's Data Breach.

44.     Plaintiff Kerner is very careful about the privacy and security of his PII. He does not knowingly transmit his PII over the internet in an unsafe manner. He is careful to store any documents containing his PII in a secure location.

---

[26] Steve Adler, *Majority of Ransomware Victims That Pay a Ransom Suffer a Second Attack*, THE HIPAA JOURNAL (Feb. 23, 2024), https://www.hipaajournal.com/majority-of-ransomware-victims-that-pay-a-ransom-suffer-a-second-attack/.
[27] *Id.*

45. As a condition of his employment with Defendant, Plaintiff Kerner provided Defendant with his PII. Defendant used that PII to facilitate its employment of Plaintiff Kerner, including payroll, and required Plaintiff Kerner to provide that PII in order to obtain employment and payment for that employment.

46. Plaintiff Kerner provided his PII to Defendant and trusted the company would use reasonable measures to protect it according to Defendant's internal policies, as well as state and federal law. Defendant obtained and continues to maintain Plaintiff Kerner's PII and has a continuing legal duty and obligation to protect that PII from unauthorized access and disclosure.

47. Plaintiff Kerner reasonably understood that a portion of the funds derived from his employment would be used to pay for adequate cybersecurity and protection of PII.

48. Plaintiff Kerner does not recall ever learning that his information was compromised in another data breach incident—other than the Data Breach at issue here.

49. On information and belief, Plaintiff Kerner's PII has already been published—or will be published imminently—by cybercriminals on the dark web.

50. Plaintiff Kerner has spent—and will continue to spend—significant time and effort monitoring his accounts to protect himself from identity theft. After all, Defendant directed Plaintiff Kerner to take those steps in its Breach Notice.

51. Plaintiff Kerner fears for his personal financial security and worries about what information was exposed in the Data Breach.

52. Because of Defendant's Data Breach, Plaintiff Kerner has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff Kerner's injuries are precisely the type of injuries that the law contemplates and addresses.

53.    Plaintiff Kerner suffered actual injury from the exposure and theft of his PII—which violates his rights to privacy.

54.    Plaintiff Kerner suffered actual injury in the form of damages to and diminution in the value of his PII. After all, PII is a form of intangible property—property that Defendant was required to adequately protect.

55.    Plaintiff Kerner suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendant's Data Breach placed Plaintiff Kerner's PII right in the hands of criminals.

56.    Because of the Data Breach, Plaintiff Kerner anticipates spending considerable amounts of time and money to try and mitigate his injuries.

57.    Today, Plaintiff Kerner has a continuing interest in ensuring that his PII—which, upon information and belief, remains backed up in Defendant's possession—is protected and safeguarded from additional breaches.

*Plaintiff Ronald Balicki*

58.    Plaintiff Ronald Balicki is a former employee of Defendant. Plaintiff Balicki received Defendant's Breach Notice via email.

59.    Thus, Defendant obtained and maintained Plaintiff Balicki's PII.

60.    As a result, Plaintiff Balicki was injured by Defendant's Data Breach.

61.    Plaintiff Balicki is very careful about the privacy and security of his PII. He does not knowingly transmit his PII over the internet in an unsafe manner. He is careful to store any documents containing his PII in a secure location.

62.    As a condition of his employment with Defendant, Plaintiff Balicki provided Defendant with his PII. Defendant used that PII to facilitate its employment of Plaintiff Balicki,

including payroll, and required Plaintiff Balicki to provide that PII in order to obtain employment and payment for that employment.

63. Plaintiff Balicki provided his PII to Defendant and trusted the company would use reasonable measures to protect it according to Defendant's internal policies, as well as state and federal law. Defendant obtained and continues to maintain Plaintiff Balicki's PII and has a continuing legal duty and obligation to protect that PII from unauthorized access and disclosure.

64. Plaintiff Balicki reasonably understood that a portion of the funds derived from the services he provided would be used to pay for adequate cybersecurity and protection of PII.

65. On information and belief, Plaintiff Balicki's PII has already been published—or will be published imminently—by cybercriminals on the dark web.

66. Plaintiff Balicki has spent—and will continue to spend—significant time and effort monitoring his accounts to protect himself from identity theft. After all, Defendant directed Plaintiff Martinez to take those steps in its Breach Notice.

67. Plaintiff Balicki fears for his personal financial security and worries about what information was exposed in the Data Breach.

68. Because of Defendant's Data Breach, Plaintiff Balicki has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff Balicki's injuries are precisely the type of injuries that the law contemplates and addresses.

69. Plaintiff Balicki suffered actual injury from the exposure and theft of his PII— which violates his rights to privacy.

70. Plaintiff Balicki suffered actual injury in the form of damages to and diminution in the value of his PII. After all, PII is a form of intangible property—property that Defendant was required to adequately protect.

71. Plaintiff Balicki suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendant's Data Breach placed Plaintiff Balicki's PII right in the hands of criminals.

72. Because of the Data Breach, Plaintiff Balicki anticipates spending considerable amounts of time and money to try and mitigate his injuries.

73. Today, Plaintiff Balicki has a continuing interest in ensuring that his PII—which, upon information and belief, remains backed up in Defendant's possession—is protected and safeguarded from additional breaches.

***Consumers Prioritize Data Security***

74. In 2024, the technology and communications conglomerate Cisco published the results of its multi-year "Consumer Privacy Survey."[28] Therein, Cisco reported the following:

> a. "For the past six years, Cisco has been tracking consumer trends across the privacy landscape. During this period, privacy has evolved from relative obscurity to a customer requirement with more than 75% of consumer respondents saying they won't purchase from an organization they don't trust with their data."[29]

---

[28] *Privacy Awareness: Consumers Taking Charge to Protect Personal*, CISCO, https://www.cisco.com/c/dam/en_us/about/doing_business/trust-center/docs/cisco-consumer-privacy-report-2024.pdf (last visited May 15, 2026).
[29] *Id*. at 3.

b. "Privacy has become a critical element and enabler of customer trust, with 94% of organizations saying their customers would not buy from them if they did not protect data properly."[30]

c. 89% of consumers stated that "I care about data privacy."[31]

d. 83% of consumers declared that "I am willing to spend time and money to protect data" and that "I expect to pay more" for privacy.[32]

e. 51% of consumers revealed that "I have switched companies or providers over their data policies or data-sharing practices."[33]

f. 75% of consumers stated that "I will not purchase from organizations I don't trust with my data."[34]

***Plaintiffs and the Proposed Class Suffered Common Injuries and Damages***

75. Because of Defendant's failure to prevent the Data Breach, Plaintiffs and Class Members suffered—and will continue to suffer—damages. These damages include, *inter alia*, monetary losses, lost time, anxiety, and emotional distress. Also, they suffered or are at an increased risk of suffering:

a. loss of the opportunity to control how their PII is used;

b. diminution in value of their PII;

c. compromise and continuing publication of their PII;

d. out-of-pocket costs from trying to prevent, detect, and recovery from identity theft and fraud;

---

[30] *Id.*
[31] *Id.* at 9.
[32] *Id.*
[33] *Id.*
[34] *Id.* at 11.

e.  lost opportunity costs and wages from spending time trying to mitigate the fallout of the Data Breach by, *inter alia*, preventing, detecting, contesting, and recovering from identity theft and fraud;

f.  delay in receipt of tax refund monies;

g.  unauthorized use of their stolen PII; and

h.  continued risk to their PII—which remains in Defendant's possession—and is thus as risk for futures breaches so long as Defendant fails to take appropriate measures to protect the PII.

### *Substantially Increased Risk of Identity Theft and Fraud*

76.  Plaintiffs and Class Members are at a heightened risk of identity theft for years to come because of the Data Breach.

77.  The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 17 C.F.R. § 248.201 (2013).

78.  The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." *Id*.

79.  The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal individuals' personal data to monetize the information. Criminals monetize the data by selling the stolen information on the internet black market (aka the Dark Web) to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

17

80.     The "Dark Web" is an unindexed layer of the internet that requires special software or authentication to access.[35] Criminals in particular favor the Dark Web as it offers a degree of anonymity to visitors and website publishers. Unlike the traditional or "surface" web, Dark Web users need to know the web address of the website they wish to visit in advance. For example, on the surface web, the CIA's web address is cia.gov, but on the Dark Web the CIA's web address is ciadotgov4sjwlzihbbgxnqg3xiyrg7so2r2o3lt5wz5ypk4sxyjstad.onion.[36]  This prevents Dark Web marketplaces from being easily monitored by authorities or accessed by those not in the know.

81.     The unencrypted PII of Plaintiffs and Class Members has or will end up for sale on the Dark Web because that is the modus operandi of hackers. In addition, unencrypted and detailed PII may fall into the hands of companies that will use it for targeted marketing without the approval of Plaintiffs and Class Members. Unauthorized individuals can easily access the Plaintiffs's and Class Members' PII.

82.     Theft of Social Security numbers also creates a particularly alarming situation for victims because those numbers cannot easily be replaced. In order to obtain a new number, a breach victim has to demonstrate ongoing harm from misuse of their SSN, and a new SSN will not be provided until after the victim has suffered the harm.

83.     In particular, the theft of Social Security numbers—in combination with other PII (e.g., name, address, date of birth)—provides cybercriminals with a "skeleton key" to commit rampant fraud and identity theft.

84.     For example, cybersecurity expert Jim Stickley explained to Time Magazine that "[i]f I have your name and your Social Security number, and you haven't gotten a credit freeze

---

[35] *What Is the Dark Web?*, EXPERIAN, https://www.experian.com/blogs/ask-experian/what-isthe-dark-web/ (last visited May 15, 2026).
[36] *Id*.

yet, you're easy pickings . . . With that, you can do whatever you want . . . You can become that person."[37] For context, Jim Stickley is a "penetration tester" who is employed by businesses "to infiltrate their systems in order to find flaws they can fix before the bad guys exploit them."[38]

85. There may also be a time lag between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. Fraud and identity theft resulting from the Data Breach may go undetected until debt collection calls commence months, or even years later. An individual may not know that their Social Security number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

86. For example, on average it takes approximately three months for consumers to discover their identity has been stolen and used, and it takes some individuals up to three years to learn that information.[39]

87. It is within this context that Plaintiffs and all other Class Members must now live with the knowledge that their PII is forever in cyberspace and was taken by people willing to use the information for any number of improper purposes and scams, including making the information available for sale on the black market.

88. Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take

---

[37] Patrick L. Austin, *'It Is Absurd.' Data Breaches Show it's Time to Rethink How We Use Social Security Numbers, Experts Say*, TIME MAGAZINE (Aug. 5, 2019) https://time.com/5643643/capital-one-equifax-data-breach-social-security/.
[38] *Id*.
[39] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 J. SYSTEMICS, CYBERNETICS & INFORMATICS 9 (2019) http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf.

on the victim's identity, or to track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

89. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data breaches are often the starting point for these additional targeted attacks on the victims.

90. Identity thieves can also use an individual's personal data and PII to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's information, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant issued in the victim's name.[40]

91. One example of criminals piecing together bits and pieces of compromised PII to create comprehensive dossiers on individuals is called "Fullz" packages.[41] These dossiers are both

---

[40] *Identity Theft and Your Social Security Number,* SOCIAL SECURITY ADMINISTRATION, 1 (2018), https://www.ssa.gov/pubs/EN-05-10064.pdf. (last visited May 15, 2026).

[41] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone

shockingly accurate and comprehensive. With "Fullz" packages, cybercriminals can cross-reference two sources of PII to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy to assemble complete dossiers on individuals. For example, they can combine the stolen PII, and with unregulated data found elsewhere on the internet (like phone numbers, emails, addresses, etc.).

92.     The development of "Fullz" packages means that the PII exposed in the Data Breach can easily be linked to data of Plaintiffs and the Class that is available on the internet. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiffs and Class Members, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiffs and other Class Members' stolen PII is being misused, and that such misuse is fairly traceable to the Data Breach.

93.     According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses that year, resulting in more than $3.5 billion in losses to individuals and business victims.[42]

---

with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.,* Brian Krebs, *Medical Records for Sale in Underground Stolen from Texas Life Insurance Firm,* KREBS ON SECURITY (Sep. 18, 2014), https://krebsonsecuritv.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm.

[42] *2019 Internet Crime Report* (Feb. 11, 2020) FED. BUREAU INTELLIGENCE, https://www.fbi.gov/news/stories/2019-internet-crime-report-released-021120 (last visited May 15, 2026).

94. Further, according to the same report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good." Yet, Defendant failed to rapidly report to Plaintiffs and the Class that their PII was stolen. Defendant's failure to promptly and properly notify Plaintiffs and Class Members of the Data Breach exacerbated Plaintiffs' and Class Members' injuries by depriving them of the earliest ability to take appropriate measures to protect their PII and take other necessary steps to mitigate the harm caused by the Data Breach.

95. Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

96. In addition to out-of-pocket expenses that can exceed thousands of dollars and the emotional toll identity theft can take, some victims must spend a considerable time repairing the damage caused by the theft of their PII. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

97. Further complicating the issues faced by victims of identity theft, data thieves may wait years before attempting to use the stolen PII. To protect themselves, Plaintiffs and Class Members will need to remain vigilant for years or even decades to come.

### *Defendant Knew—Or Should Have Known—of the Risk of a Data Breach*

98. Defendant's data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in recent years.

99. In the years immediately preceding the Data Breach, Defendant knew or should have known that Defendant's computer systems were a target for cybersecurity attacks, including

ransomware attacks involving data theft, because warnings were readily available and accessible via the internet.

100. In 2024, a record 3,158 data breaches occurred—exposing approximately 1,350,835,988 sensitive records (i.e., 211% increase year over year).[43]

101. In April 2020, ZDNet reported, in an article titled "Ransomware mentioned in 1,000+ SEC filings over the past year," that "[r]ansomware gangs are now ferociously aggressive in their pursuit of big companies. They breach networks, use specialized tools to maximize damage, leak corporate information on dark web portals, and even tip journalists to generate negative news for companies as revenge against those who refuse to pay."[44]

102. In September 2020, the United States Cybersecurity and Infrastructure Security Agency published online a "Ransomware Guide" advising that "[m]alicious actors have adjusted their ransomware tactics over time to include pressuring victims for payment by threatening to release stolen data if they refuse to pay and publicly naming and shaming victims as secondary forms of extortion."[45]

103. This readily available and accessible information confirms that, prior to the Data Breach, Defendant knew or should have known that (i) ransomware actors were targeting entities such as Defendant, (ii) ransomware gangs were ferociously aggressive in their pursuit of entities such as Defendant, (iii) ransomware gangs were leaking corporate information on dark web portals, and (iv) ransomware tactics included threatening to release stolen data.

---

[43] *2024 Data Breach Report*, IDENTITY THEFT RESOURCE CENTER (Jan. 2025), https://www.idtheftcenter.org/wp-content/uploads/2025/02/ITRC_2024DataBreachReport.pdf.
[44] Ransomware mentioned in 1,000+ SEC filings over the past year, ZDNet, https://www.zdnet.com/article/ransomware-mentioned-in-1000-sec-filings-over-the-past-year/ (last accessed September 4, 2023).
[45] Ransomware Guide, U.S. CISA, https://www.cisa.gov/stopransomware/ransomware-guide (last accessed September 4, 2023).

104. In light of the information readily available and accessible on the internet before the Data Breach, Defendant, having elected to store the unencrypted PII of thousands of its current and former employes in an Internet-accessible environment, had reason to be on guard for the exfiltration of the PII and Defendant's type of business had cause to be particularly on guard against such an attack.

105. Before the Data Breach, Defendant knew or should have known that there was a foreseeable risk that Plaintiffs' and Class Members' PII could be accessed, exfiltrated, and published as the result of a cyberattack. Notably, data breaches are prevalent in today's society therefore making the risk of experiencing a data breach entirely foreseeable to Defendant.

106. Prior to the Data Breach, Defendant knew or should have known that it should have encrypted its employees' Social Security numbers and other sensitive data elements within the PII to protect against their publication and misuse in the event of a cyberattack.

***Defendant Could Have Prevented the Data Breach***

107. Data breaches are preventable.[46] Indeed, the American Bar Association published a treatise titled the *Data Breach and Encryption Handbook* wherein the author explained that:

    a. "In almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions."[47]

    b. "Organizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised[.]"[48]

---

[46] Lucy L. Thomson, *Despite the Alarming Trends, Data Breaches Are Preventable*, DATA BREACH AND ENCRYPTION HANDBOOK (2012).
[47] *Id.* at 17.
[48] *Id.* at 28.

c.    "Most of the reported data breaches are a result of lax security and the failure to create or enforce appropriate security policies, rules, and procedures . . . . Appropriate information security controls, including encryption, must be implemented and enforced in a rigorous and disciplined manner so that a data breach never occurs." [49]

***Defendant Failed to Follow FTC Guidelines***

108.    According to the Federal Trade Commission ("FTC"), the need for data security should be factored into all business decision-making. Thus, the FTC issued numerous guidelines identifying best data security practices that businesses—like Defendant—should use to protect against unlawful data exposure.

109.    In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*. There, the FTC set guidelines for what data security principles and practices businesses must use.[50] The FTC declared that, *inter alia*, businesses must:

a.    protect the personal customer information that they keep;

b.    properly dispose of personal information that is no longer needed;

c.    encrypt information stored on computer networks;

d.    understand their network's vulnerabilities; and

e.    implement policies to correct security problems.

110.    The guidelines also recommend that businesses watch for the transmission of large amounts of data out of the system—and then have a response plan ready for such a breach.

---

[49] *Id.*

[50] *Protecting Personal Information: A Guide for Business,* FED TRADE COMMISSION (Oct. 2016) https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

111.    Furthermore, the FTC explains that companies must:

    a.    not maintain information longer than is needed to authorize a transaction;

    b.    limit access to sensitive data;

    c.    require complex passwords to be used on networks;

    d.    use industry-tested methods for security;

    e.    monitor for suspicious activity on the network; and

    f.    verify that third-party service providers use reasonable security measures.

112.    The FTC brings enforcement actions against businesses for failing to protect customer data adequately and reasonably. Thus, the FTC treats the failure—to use reasonable and appropriate measures to protect against unauthorized access to confidential consumer data—as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

113.    In short, Defendant's failure to use reasonable and appropriate measures to protect against unauthorized access to its employees' and consumers' data constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

***Defendant Failed to Follow Industry Standards***

114.    Several best practices have been identified that—at a *minimum*—should be implemented by businesses like Defendant. These industry standards include: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption (making data unreadable without a key); multi-factor authentication; backup data; and limiting which employees can access sensitive data.

26

115. Other industry standard best practices include: installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

116. Upon information and belief, Defendant failed to implement industry-standard cybersecurity measures, including failing to meet the minimum standards of both the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04) and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

117. These frameworks are applicable and accepted industry standards. And by failing to comply with these accepted standards, Defendant opened the door to the criminals—thereby causing the Data Breach.

## CLASS ACTION ALLEGATIONS

118. Plaintiffs bring this nationwide class action on behalf of themselves and on behalf of others similarly situated pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

119. The Nationwide Class that Plaintiffs seek to represent is defined as follows:

> All individuals residing in the United States whose PII was compromised in the Data Breach affecting Defendant in May 2026 and June 2026, including all those individuals who received notice of the breach.

120. Excluded from the Class are Defendant, its agents, affiliates, parents, subsidiaries, any entity in which Defendant has a controlling interest, any Defendant officer or director, any successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

121. Plaintiffs reserve the right to amend the Class definition.

122. Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on class-wide bases using the same evidence as would be used to prove those elements in individual actions asserting the same claims.

123. Ascertainability. All members of the proposed Class are readily ascertainable from information in Defendant's custody and control. After all, Defendant already identified some individuals and sent them data breach notices.

124. Numerosity. The Class Members are so numerous that joinder of all Class Members is impracticable. Upon information and belief, the proposed Class includes at least 20,648 members.

125. Typicality. Plaintiffs' claims are typical of Class Members' claims as each arises from the same Data Breach, the same alleged violations by Defendant, and the same unreasonable manner of notifying individuals about the Data Breach.

126. Adequacy. Plaintiffs will fairly and adequately protect the proposed Class's common interests. Their interests do not conflict with Class Members' interests. And Plaintiffs have retained counsel—including lead counsel—that are experienced in complex class action litigation and data privacy to prosecute this action on the Class's behalf.

127. Commonality and Predominance. Plaintiffs' and the Class's claims raise predominantly common fact and legal questions—which predominate over any questions affecting

individual Class Members—for which a class wide proceeding can answer for all Class Members. In fact, a class wide proceeding is necessary to answer the following questions:

    a.    if Defendant had a duty to use reasonable care in safeguarding Plaintiffs' and the Class's PII;

    b.    if Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

    c.    if Defendant was negligent in maintaining, protecting, and securing PII;

    d.    if Defendant breached contract promises to safeguard Plaintiffs and the Class's PII;

    e.    if Defendant took reasonable measures to determine the extent of the Data Breach after discovering it;

    f.    if Defendant's Breach Notice was reasonable;

    g.    if the Data Breach caused Plaintiffs and the Class injuries;

    h.    what the proper damages measure is; and

    i.    if Plaintiffs and the Class are entitled to damages, treble damages, and or injunctive relief.

128.    <u>Superiority.</u> A class action will provide substantial benefits and is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class Members are relatively small compared to the burden and expense that individual litigation against Defendant would require. Thus, it would be practically impossible for Class Members, on an individual basis, to obtain effective redress for their injuries. Not only would individualized litigation increase the delay and expense to all parties

and the courts, but individualized litigation would also create the danger of inconsistent or contradictory judgments arising from the same set of facts. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, ensures economies of scale, provides comprehensive supervision by a single court, and presents no unusual management difficulties.

**<u>FIRST CAUSE OF ACTION</u>**
**Gross Negligence**
**(On Behalf of Plaintiffs and the Class)**

129.    Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

130.    Plaintiffs and the Class entrusted their Private Information to Defendant on the premise and with the understanding that Defendant would safeguard their PII, use their PII for business purposes only, and/or not disclose their PII to unauthorized third parties.

131.    Defendant knowingly collected, came into possession of, and maintained Plaintiffs' and Class Members' PII, and had a duty to exercise reasonable care in safeguarding, securing, and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties.

132.    Defendant owed a duty of care to Plaintiffs and Class Members because it was foreseeable that Defendant's failure—to use adequate data security in accordance with industry standards for data security—would compromise their PII in a data breach. And here, that foreseeable danger came to pass.

133.    Defendant had full knowledge of the sensitivity of the PII and the types of harm that Plaintiffs and the Class could and would suffer if their PII was wrongfully disclosed.

134.    Defendant owed—to Plaintiffs and Class Members—at least the following duties to:

30

a. exercise reasonable care in handling and using the PII in its care and custody;

b. implement, or ensure its third-party agents implement, industry-standard security procedures sufficient to reasonably protect the information from a data breach, theft, and unauthorized use;

c. promptly detect attempts at unauthorized access; and

d. notify Plaintiff and Class Members within a reasonable timeframe of any breach to the security of their Private Information.

135. Under the FTC Act, 15 U.S.C. § 45, Defendant had a duty to use fair and adequate computer systems and data security practices to safeguard Plaintiffs and Class Members' PII.

136. Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect the PII entrusted to it. The FTC publications and orders promulgated pursuant to the FTC Act also form part of the basis of Defendant's duty to protect Plaintiffs and the Class Members' sensitive PII.

137. Defendant violated its duty under Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with applicable industry standards as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of PII Defendant had collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

138. Defendant additionally owed a duty to timely and accurately disclose to Plaintiffs and Class Members the scope, nature, and occurrence of the Data Breach. After all, this duty is

31

required and necessary for Plaintiffs and Class Members to take appropriate measures to protect their PII, to be vigilant in the face of an increased risk of harm, and to take other necessary steps to mitigate the harm caused by the Data Breach.

139. Defendant also had a duty to exercise appropriate clearinghouse practices to remove (or ensure its third-party agents removed) PII it was no longer required to retain under applicable regulations.

140. Defendant knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using of the PII of Plaintiffs and the Class involved an unreasonable risk of harm to Plaintiffs and the Class, even if the harm occurred through the criminal acts of a third party.

141. Defendant's duty to use reasonable security measures arose because of the special relationship that existed between Defendant and Plaintiffs and the Class. That special relationship arose because Plaintiff and the Class entrusted Defendant with their confidential PII, a necessary part of obtaining employment from Defendant.

142. The risk that unauthorized persons would attempt to gain access to the PII and misuse it was foreseeable. Given that Defendant (or its third-party agents) hold vast amounts of PII, it was inevitable that unauthorized individuals would attempt to access Defendant's (or its third-party agent's) databases containing the PII —whether by malware or otherwise.

143. PII is highly valuable, and Defendant knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the PII of Plaintiffs and Class Members' and the importance of exercising reasonable care in handling it.

144.     Defendant improperly and inadequately safeguarded the PII of Plaintiffs and the Class in deviation of standard industry rules, regulations, and practices at the time of the Data Breach.

145.     Defendant breached these duties as evidenced by the Data Breach.

146.     Defendant acted with wanton and reckless disregard for the security and confidentiality of Plaintiffs' and Class Members' PII by:

  a. disclosing and providing access to this information to third parties and

  b. failing to properly supervise both the way the PII was stored, used, and exchanged, and those in its employ who were responsible for making that happen.

147.     Defendant breached its duties by failing to exercise reasonable care in supervising its agents, contractors, vendors, and suppliers, and in handling and securing the personal information and PII of Plaintiffs and Class Members which actually and proximately caused the Data Breach and Plaintiffs and Class Members' injury.

148.     Defendant further breached its duties by failing to provide reasonably timely notice of the Data Breach to Plaintiffs and Class Members, which actually and proximately caused and exacerbated the harm from the Data Breach and Plaintiffs and Class Members' injuries-in-fact.

149.     Defendant has admitted that the PII of Plaintiffs and the Class was wrongfully lost and disclosed to unauthorized third persons because of the Data Breach.

150.     The specific reckless and grossly negligent acts and omissions committed by Defendant include, but are not limited to, the following:

  a. Failing to adopt, implement, and maintain adequate security measures to safeguard Plaintiffs' and Class Members' PII;

b. Failing to adequately monitor the security of its networks and systems and to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of employee information;

c. Failing to periodically ensure that its computer systems and networks had plans in place to maintain reasonable data security safeguards;

d. Failing to detect the breach at the time it began or within a reasonable time

e. thereafter; and

f. Failing to follow its own privacy policies and practices published to its employees and residents.

151. Defendant's conduct went far beyond ordinary negligence. Defendant acted with gross negligence by consciously and recklessly disregarding known risks to Plaintiffs' PII, including by failing to implement basic and industry-standard cybersecurity measures, failing to adequately monitor its systems for unauthorized access, failing to remediate known security vulnerabilities, failing to properly train employees on data security, and failing to timely detect and prevent the Data Breach. Defendant knew or should have known that its inadequate data-security practices created a high probability of harm to Plaintiffs and the Class, yet Defendant consciously failed to take reasonable steps to prevent that harm.

152. Defendant's grossly negligent conduct demonstrated a substantial lack of concern for whether injury would result to Plaintiffs and the Class. Defendant's actions and omissions constituted a reckless indifference to the rights, safety, and interests of Plaintiffs and the Class, whose sensitive personal information Defendant was entrusted to protect.

34

153. Defendant's conduct was particularly unreasonable given the nature and amount of PII obtained and stored and the foreseeable consequences of a data breach on Defendant's (or its third-party agents') systems.

154. As a direct and traceable result of Defendant's negligence and/or negligent supervision, Plaintiffs and Class Members have suffered or will suffer damages, including monetary damages, increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

155. And, on information and belief, Plaintiffs' PII has already been published—or will be published imminently—by cybercriminals on the dark web.

156. Defendant's breach of its common-law duties to exercise reasonable care and its failures and negligence actually and proximately caused Plaintiffs and Class Members actual, tangible, injury-in-fact and damages, including, without limitation, the theft of their PII by criminals, improper disclosure of their PII, lost benefit of their bargain, lost value of their PII remediate the effects of the Data Breach that resulted from and were caused by Defendant's negligence, which injury-in-fact and damages are ongoing, imminent, immediate, and which they continue to face.

<u>**SECOND CAUSE OF ACTION**</u>
**Breach of Implied Contract**
**(On Behalf of Plaintiffs and the Class)**

157. Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

158. Plaintiffs and Class Members either directly contracted with Defendant or Plaintiffs and Class Members were the third-party beneficiaries of contracts with Defendant.

159. Plaintiffs and Class Members (or their third-party agents) were required to provide their PII to Defendant as a condition of receiving services and/or employment provided by

35

Defendant. Plaintiffs and Class Members (or their third-party agents) provided their PII to Defendant or its third-party agents in exchange for Defendant's services and/or employment.

160. The contracts entered into by Plaintiffs' and Class Members' agents (for example, their employers), were made for the direct benefit of Plaintiffs and the Class.

161. Plaintiffs and Class Members (or their third-party agents) reasonably understood that a portion of the funds they paid and/or derived from their labor would be used to pay for adequate cybersecurity measures.

162. Plaintiffs and Class Members (or their third-party agents) reasonably understood that Defendant would use adequate cybersecurity measures to protect the PII that they were required to provide based on Defendant's duties under state and federal law and its internal policies.

163. Plaintiffs and the Class Members (or their third-party agents) accepted Defendant's offers by disclosing their PII to Defendant or its third-party agents in exchange for services and/or employment.

164. In turn, and through internal policies, Defendant agreed to protect and not disclose the PII to unauthorized persons.

165. In its Privacy Policy, Defendant represented that they had a legal duty to protect Plaintiffs' and Class Member's PII.

166. Implicit in the parties' agreement was that Defendant would provide Plaintiffs and Class Members (or their third-party agents) with prompt and adequate notice of all unauthorized access and/or theft of their PII.

36

167. After all, Plaintiffs and Class Members (or their third-party agents) would not have entrusted their PII to Defendant (or their third-party agents) in the absence of such an agreement with Defendant.

168. Plaintiffs and the Class (or their third-party agents) fully performed their obligations under the implied contracts with Defendant.

169. The covenant of good faith and fair dealing is an element of every contract. Thus, parties must act with honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—and not merely the letter—of the bargain. In short, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.

170. Subterfuge and evasion violate the duty of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or consist of inaction. And fair dealing may require more than honesty.

171. Defendant materially breached the contracts it entered with Plaintiffs and Class Members (or their third-party agents) by:

    a. failing to safeguard their information;

    b. failing to notify them promptly of the intrusion into its computer systems that compromised such information.

    c. failing to comply with industry standards;

    d. failing to comply with the legal obligations necessarily incorporated into the agreements; and

e.    failing to ensure the confidentiality and integrity of the electronic PII that Defendant created, received, maintained, and transmitted.

172.    In these and other ways, Defendant violated its duty of good faith and fair dealing.

173.    Defendant's material breaches were the direct and proximate cause of Plaintiffs' and Class Members' injuries (as detailed *supra*).

174.    And, on information and belief, Plaintiffs' PII has already been published—or will be published imminently—by cybercriminals on the dark web.

175.    Plaintiffs and Class Members (or their third-party agents) performed as required under the relevant agreements, or such performance was waived by Defendant's conduct.

### THIRD CAUSE OF ACTION
**Unjust Enrichment**
**(On Behalf of Plaintiffs and the Class)**

176.    Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

177.    This claim is pleaded in the alternative to the breach of implied contract claim.

178.    Plaintiffs and Class Members (or their third-party agents) conferred a benefit upon Defendant. After all, Defendant benefitted from (1) using their PII to provide services and/or facilitate employment, and (2) accepting payment and/or using their labor to derive profit.

179.    Defendant appreciated or had knowledge of the benefits it received from Plaintiffs and Class Members.

180.    Plaintiffs and Class Members (or their third-party agents) reasonably understood that Defendant would use adequate cybersecurity measures to protect the PII that they were required to provide based on Defendant's duties under state and federal law and its internal policies.

181. Defendant enriched itself by saving the costs they reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' PII.

182. Instead of providing a reasonable level of security, or retention policies, that would have prevented the Data Breach, Defendant instead calculated to avoid its data security obligations at the expense of Plaintiffs and Class Members by utilizing cheaper, ineffective security measures. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's failure to provide the requisite security.

183. Under principles of equity and good conscience, Defendant should not be permitted to retain the full value of Plaintiffs' and Class Members' (1) PII and (2) employment and/or payment because Defendant failed to adequately protect their PII.

184. Plaintiffs and Class Members have no adequate remedy at law.

185. Defendant should be compelled to disgorge into a common fund—for the benefit of Plaintiffs and Class Members—all unlawful or inequitable proceeds that it received because of its misconduct.

**FOURTH CAUSE OF ACTION**
**Breach of Fiduciary Duty**
**(On Behalf of Plaintiffs and the Class)**

186. Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

187. Given the relationship between Defendant and Plaintiffs and Class Members, where Defendant became guardian of Plaintiffs' and Class Members' PII, Defendant became a fiduciary by its undertaking and guardianship of the PII, to act primarily for Plaintiffs and Class Members, (1) for the safeguarding of Plaintiffs and Class Members' PII; (2) to timely notify Plaintiffs and Class Members of a Data Breach and disclosure; and (3) to maintain complete and accurate records of what information (and where) Defendant did and does store.

188. Defendant has a fiduciary duty to act for the benefit of Plaintiffs and Class Members upon matters within the scope of Defendant's relationship with them—especially to secure their PII.

189. Because of the highly sensitive nature of the PII, Plaintiffs and Class Members (or their third-party agents) would not have entrusted Defendant, or anyone in Defendant's position, to retain their PII had they known the reality of Defendant's inadequate data security practices.

190. Defendant breached its fiduciary duties to Plaintiffs and Class Members by failing to sufficiently encrypt or otherwise protect Plaintiffs' and Class Members' PII.

191. Defendant also breached its fiduciary duties to Plaintiffs and Class Members by failing to diligently discover, investigate, and give notice of the Data Breach in a reasonable and practicable period.

192. As a direct and proximate result of Defendant's breach of its fiduciary duties, Plaintiffs and Class Members have suffered and will continue to suffer numerous injuries (as detailed *supra*).

## FIFTH CAUSE OF ACTION
### Declaratory Judgment
### (On Behalf of Plaintiffs and the Class)

193. Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

194. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. The Court has broad authority to restrain acts, such as those alleged herein, which are tortious and unlawful.

195. In the fallout of the Data Breach, an actual controversy has arisen about Defendant's various duties to use reasonable data security. On information and belief, Plaintiffs

allege that Defendant's actions were—and *still* are—inadequate and unreasonable. And Plaintiffs and Class Members continue to suffer injury from the ongoing threat of fraud and identity theft.

196. Given its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

    a. Defendant owed—and continues to owe—a legal duty to use reasonable data security to secure the data entrusted to it;

    b. Defendant has a duty to notify impacted individuals of the Data Breach under the common law and Section 5 of the FTC Act;

    c. Defendant breached, and continues to breach, its duties by failing to use reasonable measures to the data entrusted to it; and

    d. Defendant's breach of its duties caused—and continues to cause—injuries to Plaintiffs and Class Members.

197. The Court should also issue corresponding injunctive relief requiring Defendant to use adequate security consistent with industry standards to protect the data entrusted to it.

198. If an injunction is not issued, Plaintiffs and the Class will suffer irreparable injury and lack an adequate legal remedy if Defendant experiences a second data breach.

199. And if a second breach occurs, Plaintiffs and the Class will lack an adequate remedy at law because many of the resulting injuries are not readily quantified in full and they will be forced to bring multiple lawsuits to rectify the same conduct. Simply put, monetary damages—while warranted for out-of-pocket damages and other legally quantifiable and provable damages—cannot cover the full extent of Plaintiffs and Class Members' injuries.

200. If an injunction is not issued, the resulting hardship to Plaintiffs and Class Members far exceeds the minimal hardship that Defendant could experience if an injunction is issued.

201.   An injunction would benefit the public by preventing another data breach—thus preventing further injuries to Plaintiffs, Class Members, and the public at large.

## PRAYER FOR RELIEF

Plaintiffs and Class Members respectfully request judgment against Defendant and that the Court enter an order:

A.   Certifying this case as a class action on behalf of Plaintiffs and the proposed Class, appointing Plaintiffs as Class representatives, and appointing their counsel to represent the Class;

B.   Awarding declaratory and other equitable relief as necessary to protect the interests of Plaintiffs and the Class;

C.   Awarding injunctive relief as necessary to protect the interests of Plaintiffs and the Class;

D.   Awarding Plaintiffs and the Class damages including applicable compensatory, exemplary, punitive damages, and statutory damages, as allowed by law;

E.   Awarding restitution and damages to Plaintiffs and the Class in an amount to be determined at trial;

F.   Awarding attorneys' fees and costs, as allowed by law;

G.   Awarding prejudgment and post-judgment interest, as provided by law;

H.   Granting Plaintiffs and the Class leave to amend this complaint to conform to the evidence produced at trial; and

I.   Granting other relief that this Court finds appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial for all claims so triable.

42

Date: July 1, 2026

Respectfully submitted,

*/s/ Grayson Wells*
J. Gerard Stranch, IV (TN BPR 23045)
Grayson Wells (TN BPR 039658)
John C. Roberts (TN BPR 042673)
**STRANCH, JENNINGS & GARVEY PLLC**
The Freedom Center
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203
Tel: (615) 254-8801
gstranch@stranchlaw.com
gwells@stranchlaw.com
jroberts@stranchlaw.com

Raina C. Borrelli*
**STRAUSS BORRELLI PLLC**
980 N. Michigan Avenue, Suite 1610
Chicago, Illinois 60611
T: (872) 263-1100
F: (872) 263-1109
raina@straussborrelli.com

***\*Pro hac vice forthcoming***

***Attorneys for Plaintiffs***